**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No.: 1:06-CR-52 |
| | ) | |
| MOISES ESCOBEDO | ) | |

## MEMORANDUM OF OPINION AND ORDER

This matter is before the court on the motion to suppress filed by the defendant, Moises

Escobedo ("Escobedo").  For the reasons discussed in this Order, the motion is DENIED.

## PROCEDURAL BACKGROUND

Escobedo was charged by way of an indictment with one count of violating 21 U.S.C. §

841(a)(1) for allegedly possessing with intent to distribute more than 100 kilograms of

marijuana.  Indictment, Docket at 1.  On November 8, 2007, Escobedo filed a motion to

suppress.  Docket at 37.  The court held a hearing on the motion on January 3, 2008, and directed

the parties to file briefs discussing the issues raised by the motion.  *See* Docket at 46.  Escobedo

filed a brief in support of his motion ("Defendant's Brief," Docket at 50); the United States of

America ("the government") filed a response to the motion ("Government's Response," Docket

at 51) and a brief in opposition to the motion ("Government's Brief," Docket at 52); and

Escobedo filed a reply brief ("Defendant's Reply," Docket at 53).

## FACTUAL BACKGROUND

The indictment against Escobedo was filed following a search of his home at 6102

Downingtown Road in Fort Wayne, Indiana, on or about August 19, 2006.  Motion to Suppress,

p. 1.[1]  It is uncontested that the search of Escobedo's residence occurred without a warrant.  It is

also uncontested that at the time of the search, law enforcement officers did not have a warrant to

arrest Escobedo.  Escobedo's arrest occurred after a series of events observed by, and to a large

extent orchestrated by, law enforcement.  It all began when a woman named Rachel Somers was

arrested in Phoenix, Arizona, while transporting a large amount of marijuana in a car.  *Id.*, pp. 1-

2.  Somers, driving a white Ford Crown Victoria with Indiana license plates, was stopped by an

Arizona police officer who discovered approximately 285 pounds of marijuana in the vehicle.

Government's Response, p. 1.  Somers was interviewed by an Arizona police detective named

Manera and told him that Escobedo had enlisted her to transport marijuana from Arizona to Fort

Wayne, Indiana.  *Id.*

After interviewing Somers, officers in Arizona contacted police in Fort Wayne and the

two agencies devised a plan.  Fort Wayne Vice and Narcotics Detective Frederick Ray described

the plan during his testimony at the suppression hearing.  Tr. at pp. 35-77.  Once officers removed

the marijuana from the car they instructed Somers to continue the drive to Fort Wayne.  *Id.*, p. 39-

40.  The police wanted Somers to meet with Escobedo as originally planned.  *Id.*  Somers was in

telephone contact with Detective Ray during her drive to Fort Wayne.  *Id.*, p. 42.  During this

time, Somers was also in contact with Escobedo.  *Id.*  Somers would talk to Escobedo during her

cross-country drive, then inform Detective Ray of her conversations with Escobedo.  *Id.*, p. 43.

Through his constant contact with Somers, Detective Ray learned that Escobedo had given her a

"specific date and time to arrive in Fort Wayne."  *Id.*  Escobedo directed Somers "to meet him at

---

[1]  While Escobedo did not own the home on Downingtown Road, the defendant and the
government stipulated that he had acquired "a leasehold interest in the property . . . on or about
August 16, 2006."  Defendant's Brief, Docket at 50, p. 1.

the Southgate Shopping Center located on State Road 27." *Id.*

When Somers arrived in Fort Wayne, but before she met Escobedo at the designated shopping mall parking lot, she met with Detective Ray and another Fort Wayne police officer, Detective Craig Dennis. *Id.*, p. 46. The officers placed a lookalike substance–bales of hay disguised to resemble the bales of marijuana seized by Arizona police–into the trunk of the Crown Victoria. *Id.* They also placed an alert beacon in the trunk, a listening device in the car, and "a recording device on Ms. Somers." *Id.*[2] While this was all taking place, Somers "was in constant contact with [Escobedo]." *Id.*, p. 47. Detective Ray characterize most of the conversation between Somers and Escobedo during this time as "small talk," with Escobedo "continuously ask[ing] her where she was[.]" *Id.* However, Ray also noted that Escobedo asked Somers "if she could see certain vehicles on the highway. I believe he asked her about a truck pulling a boat, if she could see that yet." *Id.*, pp. 47-48. Ray testified that these questions from Escobedo made her believe that Escobedo "was somewhere in proximity to her or at least near a landmark that she was supposed to see to let him know . . . where she was." *Id.* After fitting the Crown Victoria with a beacon and listening device, as well as the fake marijuana bales, Detective Ray instructed Somers to follow him to the designated meeting spot at the Southgate Shopping Mall. *Id.*, p. 48.

Somers and Ray remained in contact via cell phone while driving to the scheduled meeting with Escobedo. *Id.* While they were en route, Somers told Ray that Escobedo had called

---

[2] As it turned out, according to Detective Ray, neither the beacon nor the listening device functioned. The recording device placed on Ms. Somers did work, so police were able to record every conversation Somers had during this entire ordeal. They were not able, however, "to hear it ourselves as it was happening." Tr., p. 61.

her and told her that "he was behind her in traffic somewhere" and that he was driving a brown

Bonneville.  *Id*.  Ray and Somers continued on to the shopping mall, where Fort Wayne Police

Officer Brian Martin had already taken a position to conduct surveillance.  *Id*.  Somers turned into

the parking lot while Ray continued past it a short distance, then circled back to join forces with

Martin.  *Id*.  A short time later, Ray saw a brown Bonneville pull into the parking lot.  Ray saw

the male driver get out of the vehicle and walk toward (or perhaps into) a nearby store.  *Id*.  After

a few minutes, Somers walked out of the store accompanied by the male who had driven the

brown Bonneville.  *Id*., p 51.  Ray then either observed or heard over the radio from Martin that

the male was driving out of the parking lot in the Crown Victoria while Somers got into the

brown Bonneville.  *Id*.  While other officers trailed the Crown Victoria, Ray remained in the

shopping mall parking lot observing Somers.  *Id*.  He did so, he testified, for her safety.  Detective

Ray explained in his testimony as follows:

> Q. . . . Why did you remain with Ms. Somers?
>
> A.  Well, for her safety.  And we didn't know what would take place, if the car
> was going to be taken somewhere and unloaded and brought back.  We weren't
> sure exactly what the circumstances were, so I remained with her just in the event
> that Mr. Escobedo should return.[3]
>
> Q.  What sort of dangers might an informant, in Ms. Somers's sort of position,
> face with this situation?
>
> A.  Well, I suppose, if she were to be found as an informant there at that time,
> then she would be in as much danger as the suspects were willing to put her in.

*Id*.  Detective Ray also testified that based on his experience, drug traffickers dealing with

---

[3]  Detective Ray admitted that at this point in time, he did not personally identify
Escobedo as the male who arrived in the brown Bonneville and left in the Crown Victoria.  Tr.,
p. 50.  Escobedo was identified once he was arrested at his residence a short time later, as
discussed later in this recitation of facts.

amounts as large as the shipment Somers was transporting commonly use and carry weapons.

*Id.*, p. 52.  Ray testified that "shortly after Mr. Escobedo left the area, [Somers] called me and

told me that she had a feeling she was being watched by someone associated with Escobedo.

She said she wasn't sure why, but she had that feeling."  *Id.*  A short time later, according to

Ray, Somers received a phone call from Escobedo, who asked her "what's this fucking shit in

the trunk?"  *Id.*, p. 59.  Somers informed Detective Ray that she had received that phone call.  *Id.*

Detective Ray then contacted Sergeant Jonathan Noll, also with the Fort Wayne Police

Department, and told him "to go ahead and secure the residence [at Downingtown Drive] and all

occupants."  *Id.*, p. 63.  (Noll and other law enforcement officers had already taken up position

near the residence, as explained below.)  When asked what factors caused him to make the

decision to secure the Downingtown Drive residence, Ray testified as follows:

> Several factors; the fear that [Somers] had of someone watching her, Sergeant
> Noll's inability to see all sides of the house, the surveillance units couldn't see all
> the escape routes, and making the assumption that, since they found the bales of
> hay in the trunk, they would probably try to escape.  I felt it would be better to
> take them at the house than to get into a vehicle pursuit.

*Id.*, pp. 63-64.

Once Escobedo was arrested he was transported to the Fort Wayne police station, where

Detective Ray interviewed him after advising him of his rights.  *Id.*, p. 65.  Escobedo signed a

form indicating that he had been informed of, and understood, his rights.  *Id.*, p. 66; *see also*,

Government's Exhibit 3.  Video and audio recordings were made of the interview with

Escobedo.  *Id.*, p. 67.

While Detective Ray was positioned in the shopping center parking lot observing Somers

and staying in contact with her, Fort Wayne Vice and Narcotics Detective Brian Martin was also

at the scene.  Tr., pp. 8-9.  Martin testified that he personally observed the individual later identified as Escobedo arrive at the parking lot and make contact with Somers.  *Id*., p. 10.  A few minutes later, Martin observed the male get into the white Crown Victoria and begin to leave the parking lot.  *Id*., p. 11.  Detective Martin followed Escobedo to the residence on Downingtown Drive.  *Id*., p. 13.  At the residence, Martin observed Escobedo back the Crown Victoria into the garage of the home.  *Id*.  Once the Crown Victoria was parked in the garage, Martin continued his surveillance of the home from his position about ½ block away.  *Id*., p. 14.  From his surveillance position, Martin could see the front of the home but not the back.  *Id*.  While in that position, Martin personally observed three or four individuals at the house.  *Id*.  Martin "saw individuals exit the house and come out to the front yard or the front stoop area, look around, and then go directly back into the house."  *Id*., p. 15.  Martin was constantly relaying what he observed to other officers who were also positioned near the Downingtown Drive residence.  *Id*., pp. 15-16.  Martin testified that the decision was made to secure the residence and all individuals in it "so that no one left or no evidence was damaged or destroyed."  *Id*, p. 16.

Sergeant Noll testified at the suppression hearing about the events that took place at Downingtown Drive after Escobedo arrived at the home in the Crown Victoria.  Tr., pp. 21-34. Noll explained that he took up a surveillance position about 100 to 150 feet from the Downingtown home. Tr., p. 23.  From his position, Noll could see "the north side of the house and yard and just, maybe, 25–15, 25 feet of the rear fence line which faces to the west."  *Id*., p. 24.  The "entire backyard [of the home] was surrounded by about a seven-foot privacy fence." *Id*.  Therefore, Noll and the other officers were unable to see into the backyard of the residence and would have been unable to see anyone running from the residence through the back.  *Id*., pp.

6

24-25.  Noll explained that the police Emergency Services Team ("EST") was also onsite.  *Id.*, p.

25.  He testified that when EST officers move into a residence they do so to secure it "so no

evidence is destroyed or no one escapes."  *Id.*, p. 26.  EST officers do not search a residence

when they enter it, but rather "just hold the scene to make sure everyone's secure, make sure no

one's hiding, make sure there's no dangers for the detectives to come in [and] work the

investigation."  *Id.*  After the EST team secured the Downingtown Drive residence, Noll entered

the home with other detectives.  *Id.*  He noticed that there was only "one piece of furniture in the

front room, and that was the only piece of furniture I saw in the entire house."  *Id.*, pp. 26-27.

Noll also testified that there did not appear to be any electricity on in the home.  *Id.*, p. 27.  Noll

and another detective walked into the garage, where they saw the Crown Victoria with its trunk

open.  *Id.*  They saw the bales of hay in the trunk of the car and noticed that there were some car

parts laying on top of the bales.  *Id.*  Those car parts were underneath the bales of hay when the

bales were placed in the trunk by police earlier.  *Id.*, pp. 27-28.  Noll and other detectives also

noticed that there was white powder all over the kitchen floor of the house, which he testified

looked like the powder police had spread on top of the bales of hay to resemble the manner in

which the original bales of marijuana were packaged in the vehicle.  *Id.*[4]

Sergeant Noll acknowledged that officers did not have a search warrant when they

entered Escobedo's home.  *Id.*, p. 30.  Noll explained that officers do not always have a warrant

when they conduct such a raid.  He testified:

---

[4] When the real bales of marijuana were packed in the trunk of the Crown Victoria, baby powder was spread over them.  Tr., p. 45.  According to Detective Ray, this is done in an attempt to "throw off the scent of a drug detecting K-9."  *Id.*  So, when police placed the lookalike bales into the car, they covered them with baby powder so they would more closely resemble the real marijuana packages.  *Id.*

> Well, we couldn't get a warrant if we didn't know where we were going.  We
> knew what we were delivering and we knew what the conversations between our
> suspects were and our informant, and this was talked to through the Allen County
> Prosecutor.  And, you know, when that–when we knew where it was going to go
> and when we secured it, or if we had time before that, we could get the warrant.

*Id.*, p. 30.  Shortly after officers entered the home, Escobedo was arrested and taken to the Fort

Wayne Police Department, where he made allegedly incriminating admissions during an

interview with Detective Ray.  *Id.*, pp. 66-67.

## DISCUSSION

The purpose of the Fourth Amendment is protect citizens from unreasonable searches and

seizures by the government.  *U.S. v. Ginglen*, 467 F.3d 1071, 1074 (7th Cir. 2006) (citing

*Camara v. Mun. Court of City & County of S.F.,* 387 U.S. 523, 528 (1967)).  To determine

whether a search is reasonable, the court looks at the totality of the circumstances.  *Id.*

As to warrantless entries into an individual's residence, the Seventh Circuit recently explained

when such a search and seizure would be justified:

> Warrantless entries into private homes, although per se unreasonable under the
> Fourth Amendment, are subject to specific exceptions.  *Mincey v. Arizona,* 437
> U.S. 385 (1978).  And one, the exigent circumstances exception, provides that a
> "warrantless entry by criminal law enforcement officials may be legal where there
> is compelling need for official action and no time to secure a warrant."  *Michigan
> v. Tyler,* 436 U.S. 499, 509 (1978).  The government bears the burden of proving
> that its agents had an objectively reasonable belief that exigent circumstances
> existed at the time of their warrantless entry into the defendant's residence.
> *United States v. Foxworth,* 8 F.3d 540 (7th Cir. 1993).

*U.S. v. Fiasche*, 2008 WL 746843 * 4 (7th Cir. Mar. 21, 2008).  The Seventh Circuit has also

explained the standard a court should apply when determining whether a warrantless search of a

person's home was justified:

> When reviewing a warrantless search to determine if exigent circumstances
> existed, this Court conducts an objective review, analyzing whether the

> government met its burden to demonstrate that a reasonable officer had a
> "reasonable belief that there was a compelling need to act and no time to obtain a
> warrant." *United States v. Saadeh,* 61 F.3d 510, 516 (7th Cir. 1995) (citing
> *United States v. Foxworth,* 8 F.3d 540, 544 (7th Cir.1993), *cert. denied,* 511 U.S.
> 1025, 114 S.Ct. 1414, 128 L.Ed.2d 85 (1994)).

*U.S. v. Andrews*, 442 F.3d 996, 1000-01 (7th Cir. 2006).

In his motion to suppress, Escobedo seeks "to exclude from the Government's case in chief any and all evidence seized when . . . officers . . . searched Escobedo's residence . . . ." Motion to Suppress, p. 1. Escobedo "also seeks to preclude all post-arrest statements allegedly made by Escobedo because Escobedo was arrested only after the illegal search of his residence and was not arrested pursuant to a valid warrant." *Id.* Finally, Escobedo asks the court to "preclude the Government's witnesses from describing any conditions noted inside of Escobedo's house because such observations and notations by . . . [p]olice resulted from [an] illegal search of Escobedo's residence." *Id.* It is Escobedo's contention that the police had no justifiable reason to enter his residence on August 19, 2006, and therefore any evidence obtained during their search and investigation of the home, as well as any statements he made during his interview at the police station following his arrest, constitutes "fruit of the poisonous tree" and should be suppressed. The government argues in response that officers had more than enough evidence to arrest Escobedo when they did and that they were justified in entering his residence due to exigent circumstances. Government's Response, p. 1. The government also argues that "even assuming a lack of exigent circumstances, Escobedo's interview is admissible because it occurred outside the home and police had probable cause to arrest Escobedo." *Id.*

**1. Search of Residence.**

In the present case, it is clear from the testimony of officers Ray, Martin and Noll, which

the court found credible, that exigent circumstances existed that justified law enforcement's raid of Escobedo's residence.  The facts of this case make clear that officers had an abundance of evidence that Escobedo was involved in directing the transportation of a large quantity of marijuana from Arizona to Fort Wayne.  They obtained information directly from Somers when she was stopped in Arizona.  They monitored Somers as she continued her drive to Fort Wayne and she kept them informed along the way of her conversations with Escobedo.  Officers knew the details of Escobedo's plan for the transportation of the marijuana and the delivery of the drugs to the Southgate Shopping Mall in Fort Wayne.  Once Somers arrived at the designated meeting place in the Crown Victoria, officers watched as Escobedo arrived and then drove off in the car a very short time later.  Officers followed Escobedo to his Downingtown Drive residence and observed him back the Crown Victoria into the garage.

Unable to see into the back yard of the home and only partially able to view the sides, officers had no idea if Escobedo or other individuals would try to leave the house.  They knew that Escobedo, the man they had very good reason to believe was orchestrating the transportation of a large amount of marijuana, was inside the residence.  Police also observed other individuals walk outside the home, look around, and walk back in.  Also, by the time police took up position in the proximity of Escobedo's house, Somers had told Detective Ray that she was worried someone might be watching her.  Officers knew that the Crown Victoria was loaded with bales of hay rather than bales of marijuana, and therefore had a very legitimate concern that once Escobedo and anyone with him discovered that fact, they might try to flee the house.  Officers were concerned that if that happened, they could end up in a dangerous vehicle pursuit.  Until Officer Martin followed Escobedo to Downingtown Drive, the police had no idea where

10

Escobedo was taking the Crown Victoria, so it was impossible for them to obtain a search warrant in advance for any specific house.  For all of these reasons, the officers testified, they decided to enter the residence without a warrant due to what they perceived as exigent circumstances.

The portion of Escobedo's motion to suppress that deals with evidence seized in the home is somewhat curious, since the only such evidence was comprised of bales of hay disguised as marijuana (which the police already knew were in the Crown Victoria), some kind of powder on the floor of the kitchen (which police presumed was the baby powder that had been sprinkled on top of the hay bales), and the officers' personal observations of the contents and condition of the home (which had virtually no furniture and apparently no electricity).  Given the facts of this case, this evidence would appear to be a rather small part of the evidence against Escobedo that  the government would present at trial.  In fact, the court inquired about this at the suppression hearing.  At one point, the court asked defense counsel what, exactly, the defendant was seeking to suppress as far as the warrantless search of the house was concerned.  Tr., p. 53. Defense counsel stated that the defendant was "[s]eeking to suppress the officers' statements that have been made that they observed what had appeared to be a drug stash house inside Downingtown Road residence."  *Id*.  After some discussion, the court, addressing counsel for the government, observed: "[i]t seems to me that the search is a very, very minuscule part of this case. . . . You have a whole file full of evidence by the time that you actually [search].  You could arrest [Escobedo] any time, couldn't you? . . . You could arrest him at Southgate Mall. . . . So I don't get what the significance of the search is, I guess.  Except, I guess, the only relevance it would have is that explains why you had him in custody which ultimately led to the interview

11

which is now being sought to be suppressed." *Id.*, pp. 55-57.  Government counsel agreed that

the facts and circumstances surrounding the search of Escobedo's residence, in light of the fact

that the only evidence seized was bales of hay and the fact that officers observed arguably

suspicious things in the house (i.e., powder on the floor, a lack of furniture and a lack of working

electricity), was "a small part of the case." *Id.*, p. 58.   In other words, the more significant issue

before the court is whether officers had an objectively reasonable basis for the warrantless entry

into the home and the subsequent warrantless arrest of Escobedo.  Based on the facts in this case,

especially all of the evidence the police had even before they went to Escobedo's home, the

court believes that the decision by law enforcement to enter the home and arrest Escobedo was

eminently reasonable.  To reiterate, police had evidence that Escobedo was the individual

orchestrating the attempted importation of marijuana into Fort Wayne.  They also had an

objectively reasonable concern that Escobedo and/or other individuals inside the home might try

to flee once they discovered that the "stash" in the trunk of the Crown Victoria was nothing more

than bales of hay.  In the event that Escobedo or others did try to flee, officers would have been

unable to observe them doing so if they left through the rear of the house since that area was

obscured by a tall privacy fence.  And if suspects decided to flee in the Crown Victoria, the

police would find themselves in a potentially dangerous vehicle pursuit.

   If police officers fear for the safety of an informant or other individual, such a concern

may justify an entry into an otherwise private area for exigent circumstances.  *United States v.

Williams*, 633 F.2d 742, 744 (8th Cir. 1980).  The government states that in the present case, law

enforcement officers were concerned about the safety of Somers, the possibility that Escobedo

and others inside the Downingtown Drive house could escape undetected, and the potential for

danger to the suspects, the police, and the public in general if the suspects attempted to flee the home in a vehicle.  Government's Response, p. 1.  In determining the reasonableness of a warrantless entry into a private residence, "the appropriate inquiry is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer to believe that evidence might be destroyed or that there was a need to protect life or prevent serious injury." *Id.* (citing *United States v. Bell*, 500 F.3d 609, 612 (7th Cir. 2007)).  Escobedo claims in his briefs that the police could have handled the entire affair differently and that they could have obtained a warrant.  Escobedo argues that the police had no reason to fear for the safety of Somers since they had no direct evidence that she was in danger from Escobedo or any of his possible cohorts. Defendant's Brief, p. 7.  He also argues that police could have kept Somers in protective custody while they obtained a warrant to search the Downingtown Drive home.  *Id.*  Escobedo argues that police could have posted "more police in surveillance positions so that all sides of Escobedo's house were visible."  *Id.*, p. 7.  Finally, he states that if they feared the possibility of a vehicle chase, police could have simply blocked the end of Escobedo's driveway to prevent him or others from fleeing the home.  *Id.*, p. 8.  Escobedo argues that if police had taken some or all of these actions, they would have had sufficient time to obtain a warrant before entering the premises.  *Id.*  But the government points out that "[t]he question with exigent circumstances is not whether, given the benefit of hindsight, the police could have done something different; the question is whether they had, at the time, a reasonable belief that there was a compelling need to act and time to get a warrant."  Government's Brief, p. 3.  The government summarizes the factual scenario leading up to the entry into Escobedo's residence by stating that  "Detective Ray was confronted with a flurry of circumstances that posed a host of potential dangers to the

13

informant, the Downingtown neighborhood, the public at large, the police officers, and even to

the Defendant and his accomplices, and he made the decision to enter for the purpose of

preventing anyone from getting hurt.  Even if the police could have done something different in

hindsight, Detective Ray nevertheless acted reasonably in protecting public safety and

addressing the exigent circumstances."  *Id*., pp. 3-4.[5]

Given all the evidence the police had before they even went to the home, and their

concerns once they arrived there (concerns that were credibly presented by the officers'

testimony at the hearing), the court finds that exigent circumstances existed that justified the

officers' decision to enter Downingtown Drive without a search warrant.  Therefore, the

defendant's motion to suppress as it relates to the search of his home is denied.

**2.  Interview of Escobedo.**

Escobedo also seeks to suppress the statement he made to police while in custody

following his arrest.  Escobedo, relying on *Wong Sun v. United States*, 371 U.S. 471 (1963),

argues that the statement he gave at the police station was the fruit of an illegal search and

---

[5]  The government also argues that even assuming, for the sake of argument, that exigent
circumstances did not exist to justify the officers' entry into Escobedo's residence, the
"inevitable discovery" rule would result in the admissibility of anything found inside the home.
Government's Brief, p. 4.  The government's argument is that if police had taken the time to
"complet[e] the search warrant process that Detective Ray was attempting to initiate, which
would have yielded the observations of the baby powder on the kitchen floor and the
rearrangement of [the] Crown Victoria trunk's contents."  *Id*.  The government raises a
legitimate point that the "evidence" inside the Downingtown residence would very likely have
been discovered even if police had not entered the residence until much later, after having
obtained a search warrant.  "When the evidence would inevitably have been discovered without
reference to the police error or misconduct, there is no nexus sufficient to provide a taint and the
evidence is admissible."  *Id*. (citing *Nix v. Williams*, 467 U.S. 431, 448 (1984)).  Having held
that exigent circumstances justified the entry into Escobedo's residence, the court need not
address the issue of inevitable discovery any further.

should be suppressed.  Defendant's Memorandum, p. 10.  Escobedo maintains that the statements he made subsequent to his arrest were the result of an illegal search of his home and an illegal seizure of his person.  *Id.*

The government maintains that Escobedo's incriminating statements are admissible notwithstanding the fact that they did not have a search warrant to enter his residence or an arrest warrant.  As recited above, the government argues that officers had plentiful evidence against Escobedo even before his home was raided and searched to constitute probable cause for his arrest.  In fact, the government contended that Escobedo could have been arrested in the shopping center parking lot.  Consequently, the government maintains that any statements Escobedo made during his interview at the police station are admissible under *New York v. Harris*, 495 U.S. 14 (1990).  Government's Brief, p. 1.  In *Harris*, the Supreme Court held that when police have probable cause to arrest a suspect, any statement that suspect make to police after his arrest is not barred by the exclusionary rule even if the actual arrest itself was illegal.  The government states in its brief that the *Harris* case, "[d]ecided approximately twenty-seven years after *Wong Sun*, . . . cited the familiar proposition of *Wong Sun* and found it inapplicable to a police station interview similar to Escobedo's."  *Id*., p. 8.  The government argues that "*Harris* therefore rendered the general rule of *Wong Sun* inapplicable to Escobedo's situation because an unlawful entry into the home of a defendant does not make the defendant's subsequent detention outside the home unlawful if probable cause to arrest existed."  *Id*. (citing *Harris*, 495 U.S. at 18-19 and *United States v. Roche-Martinez*, 467 F.3d 591, 593-94 (7th Cir. 2006)).  In the present case, the police had probable cause to arrest Escobedo long before they entered his home.  They had a wealth of incriminating evidence against him while Somers was

15

still traveling from Arizona back to Indiana.  Once Somers arrived at the Southgate Mall in the

Crown Victoria loaded with the imposter bales of marijuana, a suspect later identified as

Escobedo picked up the car and drove it to his home.  Escobedo was arrested not simply because

the police found him in the residence or because they noticed powder on the floor or because

there was virtually no furniture in the home.  That evidence, as discussed above, is almost

inconsequential as it relates to Escobedo's arrest.  Instead, he was arrested because he was

identified by Somers as a key player in the plot to import the marijuana she was supposed to

transport to Indiana, and because Somers kept police informed of her conversations with

Escobedo during her trip.  Just prior to arriving in Fort Wayne, Somers informed police of the

meeting place Escobedo designated for them to meet and exchange cars.  As soon as Escobedo

met Somers, switched cars, and drove away from Southgate Mall in the Crown Victoria police

followed him to his residence and observed him park the car in the garage.  As a result of all of

this, the government's position is well taken.  That is, the police had probable cause to arrest

Escobedo and transport him to the police station for questioning.  Escobedo does not dispute the

fact that he signed a Waiver of Rights form before he made any statements to police.  Therefore,

any statements he made to police were the result of a legitimate custodial interrogation and

would be admissible at trial even if the police entry into his home was determined to be illegal.

Accordingly, Escobedo's motion to suppress as it pertains to the statements he made to police

after his arrest is denied.

**CONCLUSION**

For the reasons set forth in this Order, the Motion to Suppress filed by the defendant,

Moises Escobedo, is DENIED.


Date: May 12, 2008.


                                                        /s/   William C. Lee
                                                        William C. Lee, Judge
                                                        United States District Court
                                                        Northern District of Indiana